# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JULIAN CHA, derivatively on behalf of CARLOTZ, INC.,<br><br>     Plaintiff,<br><br>     v.<br><br>DAVID R. MITCHELL, LUIS IGNACIO SOLORZANO AIZPURU, KIMBERLY H. SHEEHY, LINDA B. ABRAHAM, MICHAEL W. BOR, STEVEN G. CARREL, SARAH M. KAUSS, JAMES E. SKINNER, and THOMAS W. STOLTZ,<br><br>     Defendants,<br><br>     and<br><br>CARLOTZ, INC.,<br><br>Nominal Defendant. | Case No.:<br><br><br>**DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Julian Cha ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant CarLotz, Inc. ("CarLotz" or the "Company"), files this Verified Shareholder Derivative Complaint against Defendants David R. Mitchell, Luis Ignacio Solorzano Aizpuru, Kimberly H. Sheehy, Linda B. Abraham, Michael W. Bor, Steven G. Carrel, Sarah M. Kauss, James E. Skinner, and Thomas W. Stoltz (collectively, the "Individual Defendants" and with CarLotz, "Defendants") for breaches of their fiduciary duties as directors and/or officers of CarLotz, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets,

violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding CarLotz, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by CarLotz's directors and officers from December 30, 2020 to May 25, 2021 (the "Relevant Period").

2.      CarLotz is a Delaware corporation based in Virginia that operates a consignment-to-retail used-vehicle marketplace where corporate vehicle sourcing partners and retail used-vehicle sellers can sell at prices that are usually below those of traditional dealerships.

3.      On January 21, 2021, the Company was formed as a publicly-traded corporation through the merger (the "Merger") of one of its predecessors, also called CarLotz, Inc., with the other predecessor Acamar Partners Acquisition Corp. ("Acamar Partners," also referred to pre-merger as the "Company"), a publicly-traded blank check company formed for the purpose of effecting a merger or similar business combination with one or more businesses.

4.      During the Relevant Period and leading up to the Merger, the Company touted its gross profit and gross profit per unit ("GPU") and noted a trend of growth for these figures. Moreover, while the Company discussed in its SEC filings the hypothetical risk of slowing sales, it did not reveal that this had already begun actively occurring, and therefore was an actualized rather than merely hypothetical concern. As a result of these slowing sales, the Company's gross profit and GPU would decline.

5.      On March 15, 2021, the Company disclosed its financial results for the fourth quarter and full fiscal year both ended December 31, 2020. During an earnings conference call with investors and analysts to discuss these results, Chief Financial Officer ("CFO") Defendant Thomas W. Stoltz ("Stoltz") stated that gross profit and GPU "were softer than . . . expected" because of "the surge in inventory during the quarter and the resulting lower retail unit profitability." Chief Executive Officer ("CEO") Defendant Michael W. Bor ("Bor") also reported that the additional inventory "created a logjam that resulted in slower processing and higher days to sell."

6.      On this news, the price per share of the Company's common stock fell $0.79, or 8.5%, to close March 16, 2021 at $8.45. The drop continued over the next two trading days to close at $7.83 per share on March 18, 2021, a decline in value of $0.62 per share or 7.3%.

7.      On May 10, 2021, the Company revealed its financial results for the fiscal quarter ended March 31, 2021, again showing underperforming GPU. The Company had expected retail GPU to be between $1,300 and $1,500 but instead reported $1,182.

8.      On this news, the price per share of the Company's common stock fell $0.94, or 14%, to close May 11, 2021 at $5.57. The next day, May 12, 2021, the price per share of the Company's common stock continued to fall, by $0.45 or 8%, to close at $4.12.

9.     Finally, on May 26, 2021, the Company issued a press release providing an "Update on [its] Profit-Sharing Sourcing Partner Arrangement[.]" The press release revealed that "the Company's profit-sharing corporate vehicle sourcing partner informed the Company that, in light of current wholesale market conditions, it has paused consignments to the Company." The press release revealed how damaging a development this was in acknowledging that "this sourcing partner accounted for more than 60% of the cars sold and sourced" during first quarter 2021 and "less than 50% of the cars sold and approximately 25% of cars sourced" during second quarter 2021 to date.

10.     On this news, the price per share of the Company's common stock fell $0.70, or 13.4%, to close May 26, 2021 at $4.51.

11.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) because of "surge in inventory" during the second half of 2020, the Company was experiencing a "a logjam that resulted in slower processing and higher days to sell[;]" (2) because of this, the Company's GPU would be negatively affected; (3) to minimize returns to the corporate vehicle sourcing partner accounting for over 60% of the Company's inventory, the Company engaged in aggressive pricing; (4) due to the foregoing, the Company's GPU forecast was inflated; (5) due to market conditions, this corporate vehicle sourcing partner was likely to pause consignments to the Company; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements about its business, operations, and prospects were

4

materially false and misleading and/or lacked a reasonable basis at all relevant times.

12. The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact, while one of the Individual Defendants sold Company shares at inflated prices.

13. Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

14. In light of the Individual Defendants' misconduct—which has subjected the Company, its CEO, and its CFO, to a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action") and which has further subjected the Company to the need to undertake intake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

15. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

16. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of the CEO's and CFO's liability in the Securities Class Action, of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation

against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.      Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

21.     Plaintiff is a current shareholder of CarLotz. Plaintiff has continuously held CarLotz common stock at all relevant times.

### Nominal Defendant

22.      CarLotz is a Delaware corporation with its principal executive offices at 611 Bainbridge Street, Suite 100, Richmond, Virginia 23224. CarLotz's shares trade on the

NASDAQ Global Market ("NASDAQ") under the ticker symbol "LOTZ."

**Individual Defendants**

23.     Defendant Bor is the CEO and Chairman of the Board of the Company.

24.     Defendant Stoltz is the CFO of the Company.

25.     Defendant David R. Mitchell ("Mitchell") is a Company director. Defendant Mitchell is also a Managing Director of TRP Capital Partners, LP ("TRP"), a transportation private equity investment fund. According to the proxy statement that the Company filed with the SEC on Schedule 14A on April 30, 2021 (the "2021 Proxy Statement"), as of April 14, 2021, TRP beneficially owned 19.1% of the Company's common stock of the Company, and as such Defendant Mitchell also beneficially owned 19.1% of the Company's common stock as of that date.

26.     Defendant Steven G. Carrel ("Carrel") is a Company director. Defendant Carrel is also a Managing Director of TRP. Defendant Carrel thus also beneficially owns 19.1% the Company's common stock, as of April 14, 2021.

27.     Defendant Luis Ignacio Solorzano Aizpuru ("Solorzano") is a Company director. Defendant Solorzano is also a member of the Compensation Committee and Nominating and Corporate Governance Committee. Moreover, Defendant Solorzano was a Partner and the CEO of Acamar Partners prior to the Merger. According to the 2021 Proxy Statement, a related entity, Acamar Partners Sponsor I LLC ("Acamar Sponsor"), beneficially owned 6.8% of the Company's common stock as of April 14, 2021. Thus, considered collectively with Acamar Sponsor, Defendant Solorzano beneficially owned 7.9% of the Company's common stock as of April 14, 2021.

28.     On January 21, 2021, the Company, TRP—controlled by Defendants Mitchell

and Carrel; Acamar Sponsor—controlled by Defendant Solorzano, and Defendant Bor—the Company's CEO and Chairman, entered into a stockholders' agreement (the "Stockholders Agreement") pursuant to which: (1) Defendant Bor will be nominated to the Board so long as he is the Company's Chief Executive Officer or he, together with his affiliated family trusts, holds at least 10% of the outstanding shares of common stock; (2) TRP will have the right to nominate two directors to the Board so long as it holds at least 10% of the outstanding shares of common stock; (3) Acamar Sponsor will have the right to nominate two directors to the Board, so long as Acamar Sponsor (or its managing members, collectively) holds at least 3% of the outstanding shares of common stock; and (4) all other directors (who will be independent) will be nominated by the Nominating and Corporate Governance Committee.

29.     Defendant Kimberly H. Sheehy("Sheehy") is a Company director and is the Chairman of the Audit Committee and a member of the Nominating and Corporate Governance Committee.

30.     Defendant Linda B. Abraham ("Abraham") is a Company director and is the Chair of the Compensation Committee.

31.     Defendant Sarah M. Kauss ("Kauss") is a Company director and is a member of the Audit Committee and Compensation Committee.

32.     Defendant James E. Skinner ("Skinner") is a Company director and is a member of the Audit Committee and the Chairman of the Nominating and Corporate Governance Committee.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

33.     By reason of their positions as officers, directors, and/or fiduciaries of CarLotz and because of their ability to control the business and corporate affairs of CarLotz, the Individual Defendants owed CarLotz and its shareholders fiduciary obligations of trust, loyalty,

good faith, and due care, and were and are required to use their utmost ability to control and manage CarLotz in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of CarLotz and its shareholders so as to benefit all shareholders equally.

34.    Each director and officer of the Company owes to CarLotz and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

35.    The Individual Defendants, because of their positions of control and authority as directors, and/or officers of CarLotz, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

36.    To discharge their duties, the officers and directors of CarLotz were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

37.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of CarLotz, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the officers and directors of

the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of CarLotz's Board at all relevant times.

38.     As the senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

39.     To discharge their duties, the officers and directors of CarLotz were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties the officers and directors of CarLotz were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Virginia, and the United States, and pursuant to CarLotz's own Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how CarLotz conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of CarLotz and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that CarLotz's operations would comply with all applicable laws and CarLotz's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

40.     Each of the Individual Defendants further owed to CarLotz and the shareholders the duty of loyalty requiring that each favor CarLotz's interest and that of its shareholders over

11

their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

41.     At all times relevant hereto, the Individual Defendants were the agents of each other and of CarLotz and were at all times acting within the course and scope of such agency.

42.     Because of their advisory, executive, managerial, directorial, and controlling positions with CarLotz, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

43.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by CarLotz.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

44.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

45.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act ; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

46.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of CarLotz was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

47.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

48.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of CarLotz, and was at all times acting within the course and scope of such agency.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

49.     CarLotz is a Delaware corporation based in Virginia that operates a consignment-to-retail used-vehicle marketplace where corporate vehicle sourcing partners and retail used-vehicle sellers can sell at prices that are usually below those of traditional dealerships.

50.     On January 21, 2021, the Company was formed as a publicly-traded corporation

through the Merger.

51.     During the Relevant Period and leading up to the Merger, the Company touted its gross profit and GPU and noted a trend of growth for these figures. Moreover, while the Company discussed in its SEC filings the hypothetical risk of slowing sales, it did not reveal that this had already begun actively occurring, and therefore was an actualized rather than merely hypothetical concern. As a result of these slowing sales, the Company's gross profit and GPU would decline.

**<u>False and Misleading Statements</u>**

***December 30, 2020 Prospectus***

52.     On December 30, 2020, the Company filed a prospectus with the SEC on Form 424B3 (the "Prospectus"). The Prospectus stated the following regarding CarLotz Inc.'s inventory build-up:

> In March 2020, the World Health Organization declared the outbreak and spread of the COVID-19 virus a pandemic. COVID-19 impacted both sales and inventory count from March through September 2020. Unit volumes hit a trough in April 2020, with 40% year-over-year declines. We implemented proactive cost-structure optimization measures that helped ensure we maintained sufficient liquidity and we implemented a number of measures to protect the health and safety of our customers and our workforce. Our May 2020 sales grew over 40% month-over-month as travel restrictions began to ease. As wholesale prices skyrocketed, we used our asset-light, non-competitive vehicle sourcing model to defend and grow our margins. With our maintained focus, we delivered our most profitable months since our inception and we believe we are poised to return to industry-leading growth. ***Our retail vehicle units sold were 583 in October and 624 in November, with our starting inventory increasing to 2,172 vehicles as of November 1, 2020 and 2,273 as of December 1, 2020 as compared to 1,567 vehicles available for sale as of September 30, 2020, as we accelerated intake from a rapidly growing national OEM account.***

(Emphasis added.)

53.     The Prospectus framed risks from this inventory buildup as potential rather than actualized, stating: "If we are unable to operate our processing centers efficiently, we ***could***

experience delivery delays, a decrease in the quality of our reconditioning services, ***delays in listing our inventory, additional expenses and loss of potential and existing corporate vehicle sourcing partners*** and retail sellers and subsequent revenues, which ***may*** materially and adversely affect our business, financial condition and results of operations." (Emphasis added.)

54.     The Prospectus stated, regarding its corporate vehicle sourcing partners that: "For the nine months ended September 30, 2020, three of our corporate vehicle sourcing partners, with whom we do not have long term consignment contracts, accounted for 49% of the cars we sold." The Prospectus continued that: "For the six months in the period ended November 30, 2020, two of our corporate vehicle sourcing partners, with whom we do not have long-term consignment contracts, accounted for more than 50% of the cars we sold and more than 50% of our revenues during this period was derived from the sale of these cars." The Prospectus did not discuss the aggressive pricing the Company was engaged in which would threaten these relationships, and that a pause in one or more of these relationships was likely.

55.     The Prospectus stated that retail GPU increased "to $1,900 per unit for the nine months ended September 30, 2020 . . . driven by a shift in the sale of owned units to consigned units." However, the Prospectus stated that GPU ***could*** "fluctuate from period to period" due to the Company's "alternative fee arrangements with certain of our corporate vehicle sourcing partners." Specifically, the Company stated in the Prospectus:

> In addition to our flat fee pricing model, we enter into alternative fee arrangements with certain of our corporate vehicle sourcing partners, which can include arrangements where we share a percentage of vehicle sale proceeds and/or customer fees with our corporate sourcing partners. ***Under these sharing arrangements, our gross profit for a particular unit could be higher or lower than the gross profit per unit we would realize under our flat fee pricing model depending on the unit's sale price and fees we are able to charge in connection with the sale***. As we do not have binding long term contracts with our corporate vehicle sourcing partners and do not require them to make vehicles available to us, our mix of vehicles sourced under alternative fee arrangements is likely to fluctuate over time. Our

15

gross profit per unit is therefore likely to fluctuate from period to period, perhaps significantly, due to our sourcing partner mix as well as due to the sales prices and fees we are able to collect on the vehicles we source under alternative fee arrangements.

(Emphasis added.)

56.     The statements in paragraphs ¶¶ 52–55 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: ((1) because of "surge in inventory" during the second half of 2020, the Company was experiencing a "a logjam that resulted in slower processing and higher days to sell[;]" (2) because of this, the Company's GPU would be negatively affected; (3) to minimize returns to the corporate vehicle sourcing partner accounting for over 60% of the Company's inventory, the Company engaged in aggressive pricing; (4) due to the foregoing, the Company's GPU forecast was inflated; (5) due to market conditions, this corporate vehicle sourcing partner was likely to pause consignments to the Company; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### *February 11, 2021 Registration Statement*

57.     On February 11, 2021, the Company filed a registration statement with the SEC on Form S-1 (the "Registration Statement"). The Registration Statement incorporated the Prospectus and repeated its false and misleading statements. The Registration Statement was signed by each of the Individual Defendants. The Registration Statement stated the following regarding CarLotz Inc.'s inventory build-up:

In March 2020, the World Health Organization declared the outbreak and spread of the COVID-19 virus a pandemic. COVID-19 impacted both sales and inventory

count from March through September 2020. Unit volumes hit a trough in April 2020, with 40% year-over-year declines. We implemented proactive cost-structure optimization measures that helped ensure we maintained sufficient liquidity and we implemented a number of measures to protect the health and safety of our customers and our workforce. Our May 2020 sales grew over 40% month-over-month as travel restrictions began to ease. As wholesale prices skyrocketed, we used our asset-light, non-competitive vehicle sourcing model to defend and grow our margins. With our maintained focus, we delivered our most profitable months since our inception and we believe we are poised to return to industry-leading growth. ***Our retail vehicle units sold were 583 in October and 624 in November, with our starting inventory increasing to 2,172 vehicles as of November 1, 2020 and 2,273 as of December 1, 2020 as compared to 1,567 vehicles available for sale as of September 30, 2020, as we accelerated intake from a rapidly growing national OEM account.***

(Emphasis added.)

58.     The Registration Statement framed risks from this inventory buildup as potential rather than actualized, stating: "If we are unable to operate our processing centers efficiently, we ***could*** experience delivery delays, a decrease in the quality of our reconditioning services, ***delays in listing our inventory, additional expenses and loss of potential and existing corporate vehicle sourcing partners*** and retail sellers and subsequent revenues, which ***may*** materially and adversely affect our business, financial condition and results of operations." (Emphasis added.)

59.     The Registration Statement stated, regarding its corporate vehicle sourcing partners that: "For the nine months ended September 30, 2020, three of our corporate vehicle sourcing partners, with whom we do not have long term consignment contracts, accounted for 49% of the cars we sold." The Registration Statement continued that: "For the six months in the period ended November 30, 2020, two of our corporate vehicle sourcing partners, with whom we do not have long-term consignment contracts, accounted for more than 50% of the cars we sold and more than 50% of our revenues during this period was derived from the sale of these cars." The Registration Statement did not discuss the aggressive pricing the Company was engaged in which would threaten these relationships, and that a pause in one or more of these relationships

17

was likely.

60.     The Registration Statement stated that retail GPU increased "to $1,900 per unit for the nine months ended September 30, 2020 . . . driven by a shift in the sale of owned units to consigned units." However, the Registration Statement stated that GPU ***could*** "fluctuate from period to period" due to the Company's "alternative fee arrangements with certain of our corporate vehicle sourcing partners." Specifically, the Company stated in the Registration Statement:

> In addition to our flat fee pricing model, we enter into alternative fee arrangements with certain of our corporate vehicle sourcing partners, which can include arrangements where we share a percentage of vehicle sale proceeds and/or customer fees with our corporate sourcing partners. ***Under these sharing arrangements, our gross profit for a particular unit could be higher or lower than the gross profit per unit we would realize under our flat fee pricing model depending on the unit's sale price and fees we are able to charge in connection with the sale***. As we do not have binding long term contracts with our corporate vehicle sourcing partners and do not require them to make vehicles available to us, our mix of vehicles sourced under alternative fee arrangements is likely to fluctuate over time. Our gross profit per unit is therefore likely to fluctuate from period to period, perhaps significantly, due to our sourcing partner mix as well as due to the sales prices and fees we are able to collect on the vehicles we source under alternative fee arrangements.

(Emphasis added.)

61.     The statements in paragraphs ¶¶ 57–60 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the identified statements failed to disclose that: (1) because of "surge in inventory" during the second half of 2020, the Company was experiencing a "a logjam that resulted in slower processing and higher days to sell[;]" (2) because of this, the Company's GPU would be negatively affected; (3) to minimize returns to the corporate vehicle sourcing partner accounting for over 60% of the Company's inventory, the Company engaged in aggressive pricing; (4) due to the foregoing, the Company's GPU forecast was inflated; (5) due to market

conditions, this corporate vehicle sourcing partner was likely to pause consignments to the Company; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**The Truth Begins Emerging as the False and Misleading Statements Continue**

*March 15, 2021 Conference Call*

62.     On March 15, 2021, the Company revealed that its profits were negatively impacted by the surge in inventory during the fourth quarter 2020. During an earnings conference call with investors and analysts to discuss the fourth quarter and full year 2020 results, Defendant Stoltz stated that profits were negatively affected by "the surge in inventory during the quarter and the ***resulting lower retail unit profitability, as a result of slower sell-throughs and more vehicles wholesaled***." (Emphasis added.) Defendant Bor likewise stated that **"*[t]he additional inventory*** that we secured to drive our growth put pressure on our processing centers and ***created a logjam that resulted in slower processing and higher days to sell***," and Defendant Stoltz stated that as a result, gross profit and GPU "increased 25%, but were softer than we expected." (Emphasis added.)

63.     On this news, the price per share of the Company's common stock fell $0.79, or 8.5%, to close March 16, 2021 at $8.45. The drop continued over the next two trading days to close at $7.83 per share on March 18, 2021, a decline in value of $0.62 per share or 7.3%.

64.     Still, during the same call, Defendant Bor stated that CarLotz "[is] remediating [these issues] through increased staffing, enhanced leadership, and process improvements." Defendant Stoltz also sought to assure investors by nothing that "[a]s we work through this excess inventory, a large majority of what we're selling right now is this profit share program

19

and as we get our inventory levels more in line with where they should be based on the demand in our existing hubs, we will see the GPU improve substantially on that front." Defendant Stoltz continued that the Company "expect[s] our flow of inventory to better match demand now through the balance of this year." Defendant Stoltz added: "In the meantime, we expect the higher than ideal inventory levels that we saw earlier this year in our existing hubs to impact our first quarter 2021 gross profit and second quarter to a lesser extent, which impacts our full-year gross profit and GPU guidance."

### *March 15, 2021 Form 10-K*

65.     The same day, March 15, 2021 the Company filed its annual report on Form 10-K with the SEC for the period ended December 31, 2020 (the "2020 10-K"). The 2020 10-K was signed by each of the Individual Defendants and contained certifications signed by Defendants Bor and Stoltz, pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX"), attesting to the accuracy of the financial statements contained in the 1Q18 10-Q, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors. With regard to the Company's sourcing partners, the 2020 10-K stated:

> ***One or more of our corporate vehicle sourcing partners may represent 10% or more of our total vehicles consigned, and at times significantly more, in the normal course of our vehicle sourcing***.
>
> One or more of our corporate vehicle sourcing partners will often represent 10% or more of the vehicles we source over a particular period. For example, during the year ended December 31, 2020, two of our corporate vehicle sourcing partners, with whom we do not have long-term consignment contracts, accounted for over 40% of the cars we sold. ***Furthermore, for the fourth quarter of 2020 and continuing during the first quarter of 2021 to date, one of our corporate vehicle sourcing partners has accounted for over 60% of our vehicles sourced. Over time, we may have concentrations of 10% or more for a number of reasons, and the concentrations will often vary among corporate vehicle sourcing partners***. Some corporate vehicle sourcing partners may make a supply of vehicles available at certain times of a given year, while others may increase or decrease

their flow of vehicles for a number of reasons, including the performance of their business or prevailing business considerations and economic conditions.

Furthermore, at times, we may source a significantly higher portion of our consigned vehicles from one or more corporate vehicle sourcing partners. Such concentrations can result from a variety of factors, some of which are beyond our control. During any given time period, we may elect to source a higher percentage of vehicles from one or more corporate vehicle sourcing partners for a variety of reasons, including the availability of specific vehicle makes and models.

***Sourcing a significant portion of our consigned vehicles from a limited number of corporate vehicle sourcing partners exposes us to a number of risks. Our agreements with our corporate vehicle sourcing partners are generally subject to cancellation by either party upon 30 to 90 days' notice***. Generally, corporate vehicle sourcing partners make non-binding long-term commitments to us regarding consignment volumes. ***If a corporate vehicle sourcing partner from which we are sourcing a significant portion of our vehicles were to cease or significantly reduce making vehicles available to us, it could adversely affect our business, financial condition and results of operations as we would likely need to increase our sourcing of vehicles from other vehicle sourcing partners potentially on less favorable terms and conditions.*** Such an effort may take a number of months and may not precisely replicate the variety and quality of vehicles we have been sourcing from this single source. Further, we could be required to increase our purchasing of vehicles to maintain optimal inventory levels and mix as we work to increase vehicle supply from other vehicle sourcing partners, which could negatively affect our margins and gross profit per vehicle. Furthermore, having a high concentration of vehicles in our inventory on consignment from a single corporate vehicle sourcing partner could indirectly expose us to credit risk with respect to that corporate vehicle sourcing partner as we may be restricted from selling those vehicles or realizing profits on the sale of those vehicles in the event of that corporate vehicle sourcing partner's insolvency.

(First emphasis in original; subsequent emphases added.)

66.     Furthermore, the 2020 10-K framed a potential GPU decline as a possibility

stemming from the nature of fee arrangements with corporate vehicle sourcing partners, stating:

For the fourth quarter of 2020 and continuing during the first quarter of 2021 to date, one of our corporate vehicle sourcing partners with whom we have an alternative fee arrangement has accounted for over 60% of our vehicles sourced.

Under our fee arrangement with this corporate vehicle sourcing partner, vehicles are returned to the corporate vehicle sourcing partner from consignment if the vehicle has not been sold through our retail channel within a specified time period.

In such instances, we are responsible for the expenses we have incurred with respect to the vehicle, including shipping costs and any refurbishment costs we have incurred. *We have returned a number of vehicles from consignment during the first quarter of 2021 to date and expect to continue to return vehicles into the second quarter of 2021 as we seek to better match our intake of vehicles under this arrangement to our sales and reconditioning capacity. The expenses associated with these returned vehicles will reduce our gross profit during the first quarter of 2021 and for subsequent periods during which we experience such vehicle returns*.

(Emphasis added.)

### *March 19, 2021 Registration Statement*

67.     On March 19, 2021, the Company filed an amended Registration Statement with the SEC on Form S-1/A that substantially repeated some of the false and misleading statements contained in the Prospectus and the original Registration Statement. It was signed by, or on behalf of, each of the Individual Defendants. The amended Registration Statement stated the following regarding CarLotz Inc.'s inventory build-up:

In March 2020, the World Health Organization declared the outbreak and spread of the COVID-19 virus a pandemic. During initial shelter in place orders and economic shutdowns, we saw a decrease in sales activity as consumers for the most part stayed home during the months of March through May of 2020. As our sales began to return to pre-COVID-19 levels late in the second quarter of 2020, the ongoing OEM plant shut-downs and repossession moratoriums limited vehicle supply from our corporate vehicle sourcing partners through most of the third quarter. During this time, we maintained our aggressive cost cutting measures by limiting marketing expense and inventory purchases in an effort to preserve liquidity. *As we exited the third quarter and relaxed our capital preservation strategy, we saw record consignment and inventory volume that led to record quarterly unit sales and revenue.*

(Emphasis added.)

68.     The amended Registration Statement framed risks from this inventory buildup as potential rather than actualized, stating: "If we are unable to operate our processing centers efficiently, we *could* experience delivery delays, a decrease in the quality of our reconditioning services, *delays in listing our inventory, additional expenses and loss of potential and existing*

*corporate vehicle sourcing partners* and retail sellers and subsequent revenues, which *may* materially and adversely affect our business, financial condition and results of operations." (Emphasis added.)

69.     The amended Registration Statement stated, regarding its corporate vehicle sourcing partners that: "For the year ended December 31, 2020, two of our corporate vehicle sourcing partners, with whom we do not have long-term consignment contracts, accounted for over 40% of the cars we sold. Furthermore, for the fourth quarter of 2020 and continuing during the first quarter of 2021 to date, one of our corporate vehicle sourcing partners has accounted for over 60% of our vehicles sourced." The amended Registration Statement did not discuss the aggressive pricing the Company was engaged in which would threaten these relationships, and that a pause in one or more of these relationships was likely.

### *March 23, 2021 Second Prospectus*

70.     On March 23, 2021, the Company filed another prospectus with the SEC on Form 424B3 (the "Second Prospectus") that repeated some of the false and misleading statements contained in the Prospectus and the original and amended Registration Statements. The Second Prospectus stated the following regarding CarLotz Inc.'s inventory build-up:

> In March 2020, the World Health Organization declared the outbreak and spread of the COVID-19 virus a pandemic. During initial shelter in place orders and economic shutdowns, we saw a decrease in sales activity as consumers for the most part stayed home during the months of March through May of 2020. As our sales began to return to pre-COVID-19 levels late in the second quarter of 2020, the ongoing OEM plant shut-downs and repossession moratoriums limited vehicle supply from our corporate vehicle sourcing partners through most of the third quarter. During this time, we maintained our aggressive cost cutting measures by limiting marketing expense and inventory purchases in an effort to preserve liquidity. *As we exited the third quarter and relaxed our capital preservation strategy, we saw record consignment and inventory volume that led to record quarterly unit sales and revenue.*

(Emphasis added.)

71.     The Second Prospectus framed risks from this inventory buildup as potential rather than actualized, stating: "If we are unable to operate our processing centers efficiently, we *could* experience delivery delays, a decrease in the quality of our reconditioning services, ***delays in listing our inventory, additional expenses and loss of potential and existing corporate vehicle sourcing partners*** and retail sellers and subsequent revenues, which ***may*** materially and adversely affect our business, financial condition and results of operations." (Emphasis added.)

72.     The Second Prospectus stated, regarding its corporate vehicle sourcing partners that: "For the year ended December 31, 2020, two of our corporate vehicle sourcing partners, with whom we do not have long-term consignment contracts, accounted for over 40% of the cars we sold. Furthermore, for the fourth quarter of 2020 and continuing during the first quarter of 2021 to date, one of our corporate vehicle sourcing partners has accounted for over 60% of our vehicles sourced." The Second Prospectus did not discuss the aggressive pricing the Company was engaged in which would threaten these relationships, and that a pause in one or more of these relationships was likely.

73.     The statements in paragraphs ¶¶ 64–72 above were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, the Individual Defendants failed, or caused the Company to fail, to disclose that : (1) to minimize returns to the corporate vehicle sourcing partner accounting for over 60% of the Company's inventory, the Company engaged in aggressive pricing; (2) due to the foregoing, the Company's GPU forecast was inflated; (3) due to market conditions, this corporate vehicle sourcing partner was likely to pause consignments to the Company; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's positive statements about the Company's business, operations, and prospects were materially

misleading and/or lacked a reasonable basis.

### April 30, 2021 Proxy Statement

74.     On April 30, 2021 the Company filed the 2021 Proxy Statement with the SEC. Defendants Bor, Abraham, Carrel, Kauss, Mitchell, Sheehy, Skinner, and Solorzano solicited the 2021 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[1]

75.     The 2021 Proxy Statement called for Company shareholders to, *inter alia*: (1) elect Defendants Mitchell, Sheehy, and Solorzano to the Board; and (2) ratify the appointment of Deloitte & Touche LLP as the Company's independent auditor for 2021.

76.     The 20210 Proxy Statement said the following regarding the Board's risk oversight function, both on page 3 and page 14:

> Our Board has extensive involvement in the oversight of risk management related to us and our business and accomplishes this oversight through the regular reporting to our Board by the Audit Committee. The Audit Committee represents our Board by periodically reviewing our accounting, reporting and financial practices, including the integrity of our financial statements, the surveillance of administrative and financial controls and our compliance with legal and regulatory requirements. Through its regular meetings with management, the Audit Committee reviews and discusses all significant areas of our business and summarizes for our Board all areas of risk and the appropriate mitigating factors. In addition, our Board receives periodic detailed operating performance reviews from management.

77.     The 2021 Proxy Statement was materially false and misleading because it failed to disclose that contrary to the 2021 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not

---

[1] Plaintiff's allegations with respect to the misleading statements in the 2021 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements, and thus the Individual Defendants on the Board were breaching their fiduciary duties.

78.     The 2021 Proxy Statement also failed to disclose that: (1) to minimize returns to the corporate vehicle sourcing partner accounting for over 60% of the Company's inventory, the Company engaged in aggressive pricing; (2) due to the foregoing, the Company's GPU forecast was inflated; (3) due to market conditions, this corporate vehicle sourcing partner was likely to pause consignments to the Company; and (4) the Company failed to maintain internal controls.

79.     As a result of the material misstatements and omissions contained in the 2021 Proxy Statement, Company shareholders, *inter alia*, elected Defendants Mitchell, Sheehy, and Solorzano to the Board, allowing them to continue breaching their fiduciary duties.

### May 10, 2021 Press Release and Earning Call

80.     On May 10, 2021, the Company announced its first quarter 2021 financial results, which revealed that GPU fell below expectations, in the following chart:

|  | Guidance | Results |  |
|---|---|---|---|
| New Hub Openings | Three | Three | Met Expectations |
| Retail Units Sold | 1,900 to 2,100 | 2,554 | Exceeded Expectations |
| Net Revenue | $42 to $46 million | $56.6 million | Exceeded Expectations |
| Gross Profit | $1.6 to $2.0 million | $2.0 million | Met Expectations |
| Retail Gross Profit per Unit ("Retail GPU") | $1,300 to $1,500 | $1,182 | Below Expectations |
| SG&A Expenses | $17 to $19 million | $18.9 million, excluding non-cash stock compensation expense of $42 million | Met Expectations |
| Net Loss | $(16) to $(15) million | $(15) million | Met Expectations |

81.     That same day, May 10, 2021, the Company held an earnings call with investors and analysts to discuss the quarter's results. During the call, Defendant Stoltz acknowledged that

"gross profit and retail GPU both decreased year-over-year as a result of the carryover of Q4 excess inventory as related to our profit share account." However, Defendant Stoltz maintained that the Company had "cleared substantially all of this aged inventory in the quarter ahead of schedule with aggressive pricing rather than absorbing shipping and reconditioning costs on vehicles returns to the client. While this negatively impacted our retail GPU in the quarter, we did achieve the high end of our gross profit guidance by selling more of these units late in the quarter." While claiming that retail GPU would "improve," Defendant Bor noted that the Company would "not to give specific guidance[.]"

82.     On this news, the price per share of the Company's common stock fell $0.94, or 14%, to close May 11, 2021 at $5.57. The next day, May 12, 2021, the price per share of the Company's common stock continued to fall, by $0.45 or 8%, to close at $4.12.

### *May 11, 2021 Prospectus Supplement*

83.     Also on May, 10, 2021, the Company filed a prospectus supplement with the SEC on Form 424B3 (the "Prospectus Supplement") that repeated some of the false and misleading statements contained in the previous prospectuses and the original and amended Registration Statements. The Prospectus Supplement noted, regarding one of the Company's corporate vehicle sourcing partners that: "For the three months ended March 31, 2021, one of our corporate vehicle sourcing partners, with whom we do not have long-term consignment contracts, accounted for more than 60% of the cars we sold and more than 60% of our retail vehicle revenues during this period was derived from the sale of these cars." The Prospectus Supplement did not discuss that a pause in this relationship was likely.

84.     The above statements identified in ¶¶ 80, 81, and 83 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business,

operations, and prospects. Specifically, the identified statements failed to disclose that: (1) due to market conditions, this corporate vehicle sourcing partner was likely to pause consignments to the Company; and (2) the Company failed to maintain internal controls. As a result of the foregoing, the Company's positive statements about its business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### The Truth Fully Emerges

85.     On May 26, 2021, the Company announced an update to its profit-sharing sourcing partner arrangement. Specifically, the Company stated that its "profit-sharing corporate vehicle sourcing partner informed the Company that, in light of current wholesale market conditions, it has paused consignments to the Company." Moreover, this partner "accounted for more than 60% of the cars sold and sourced" during first quarter 2021 and "less than 50% of the cars sold and approximately 25% of cars sourced" during second quarter 2021 to date. As a result, the Company lowered its fiscal 2021 outlook:

> #### Updated 2021 Outlook
>
> The Company is updating its 2021 outlook and financial guidance and comments with respect to its expected second quarter 2021 performance previously provided on May 10, 2021 as a result of:
> - the current business climate, as impacted by the lack of vehicles from this profit-sharing account, coupled with the unpredictable timeline of the chip shortage for new cars and its impact on the wholesale and retail automotive markets; and
> - the slippage in certain hub openings to later than previously expected.
>
> For the full year 2021, the Company expects the following results. This 2021 outlook assumes that, in the second quarter of 2021, the Company will sell greater than 2,000 retail units and will achieve a gross profit per unit of at least $1,800.

| New Hub Openings | 14 to 16 hub openings, most of which are expected to open in the back half of the year |
|---|---|
| Retail Units Sold | 13,000 to 15,000, which represents more than a 100% increase over 2020 retail units sold |
| Net Revenue | $272 to $317 million, which represents more than a 125% increase over 2020 net revenue |
| Gross Profit | $20 to $26 million, which represents more than a 75% increase over 2020 gross profit |
| Retail GPU | $1,650 to $1,850 |
| SG&A Expenses | $98 to $102 million, excluding non-cash stock compensation expense expected to be approximately $52 million |
| Adjusted EBITDA* | $(82) to $(72) million |
| Weighted Average Common Stock Shares Outstanding | 111 million shares |
| Capital Expenditures | $45 to $50 million |

146.    On this news, the price per share of the Company's common stock fell $0.70, or 13.4%, to close May 26, 2021 at $4.51.

## DAMAGES TO CARLOTZ

147.    As a direct and proximate result of the Individual Defendants' misconduct, CarLotz has lost and will continue to lose and expend many millions of dollars.

148.    Such expenditures include, but are not limited to, the fees associated with the Securities Class Action filed against the Company and the Company's CEO and CFO, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

149.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

150.    As a direct and proximate result of the Individual Defendants' conduct, CarLotz has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their

29

misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

151.    Plaintiff brings this action derivatively and for the benefit of CarLotz to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of CarLotz, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

152.    CarLotz is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

153.    Plaintiff is, and has been at all relevant times, a shareholder of CarLotz. Plaintiff will adequately and fairly represent the interests of CarLotz in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

154.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

155.    A pre-suit demand on the Board of CarLotz is futile and, therefore, excused. At the time this suit was filed, the Board was comprised of eight members: Defendants Bor, Abraham, Carrel, Kauss, Mitchell, Sheehy, Skinner, and Solorzano (the "Director Defendants"). Plaintiff needs only to allege demand futility as to four of eight Director Defendants who are on the Board at the time this action is commenced.

156.    Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

157.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in the foregoing scheme. The fraudulent scheme were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

158.    Additional reasons that demand on Defendant Bor is futile follow. Defendant Bor is the Company's CEO and the Chairman of the Board. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Bor with his principal occupation for which he receives handsome compensation As CEO, Defendant Bor was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period, including those which he personally made on earnings conference calls, and those which he signed in the original Registration Statement, amended Registration Statement, and 2020 10-K—for which he also signed SOX certifications. In addition, the 2021 Proxy Statement was solicited on his behalf and contained false and misleading statements. As the Company's highest officer and as the trusted Board Chairman, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements,

consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Bor is a defendant in the Securities Class Action. For these reasons, Defendant Bor breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

159.    Additional reasons that demand is futile on Defendant Abraham follow. As a Company director, Defendant Abraham is entitled to significant compensation. She signed, or had signed on her behalf, the Registration Statement, the amended Registration Statement, and the 2020 10-K, which each contained false and misleading statements. In addition, the 2020 Proxy Statement was solicited on her behalf and contained false and misleading statements. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Abraham breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

160.    Additional reasons that demand is futile on Defendant Carrel follow. As a Company director, Defendant Carrel is entitled to significant compensation. He signed, or had signed on his behalf, the Registration Statement, the amended Registration Statement, and the 2020 10-K, which each contained false and misleading statements. In addition, the 2020 Proxy Statement was solicited on his behalf and contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal

controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Carrel breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

161.    Additional reasons that demand is futile on Defendant Kauss follow. As a Company director, Defendant Kauss is entitled to significant compensation. She signed, or had signed on her behalf, the Registration Statement, the amended Registration Statement, and the 2020 10-K, which each contained false and misleading statements. In addition, the 2020 Proxy Statement was solicited on her behalf and contained false and misleading statements. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Kauss breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

162.    Additional reasons that demand is futile on Defendant Mitchell follow. As a Company director, Defendant Mitchell is entitled to significant compensation. He signed, or had signed on his behalf, the Registration Statement, the amended Registration Statement, and the 2020 10-K, which each contained false and misleading statements. In addition, the 2020 Proxy Statement was solicited on his behalf and contained false and misleading statements that contributed to his reelection to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in

the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Mitchell breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

163.    Additional reasons that demand is futile on Defendant Sheehy follow. As a Company director, Defendant Sheehy is entitled to significant compensation. She signed, or had signed on her behalf, the Registration Statement, the amended Registration Statement, and the 2020 10-K, which each contained false and misleading statements. In addition, the 2020 Proxy Statement was solicited on her behalf and contained false and misleading statements that contributed to her reelection to the Board. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Sheehy breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

164.    Additional reasons that demand is futile on Defendant Skinner follow. As a Company director, Defendant Skinner is entitled to significant compensation. He signed, or had signed on his behalf, the Registration Statement, the amended Registration Statement, and the 2020 10-K, which each contained false and misleading statements. In addition, the 2020 Proxy Statement was solicited on his behalf and contained false and misleading statements. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Skinner breached his fiduciary duties,

faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

165.    Additional reasons that demand is futile on Defendant Solorzano follow. As a Company director, Defendant Solorzano is entitled to significant compensation. He signed, or had signed on his behalf, the Registration Statement, the amended Registration Statement, and the 2020 10-K, which each contained false and misleading statements. In addition, the 2020 Proxy Statement was solicited on his behalf and contained false and misleading statements that contributed to his reelection to the Board. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Solorzano breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

166.    Additional reasons that demand on the Board is futile follow.

146.    Defendant Mitchell and Carrel are managing directors of TRP. TRP has done substantial business with CarLotz, making Defendants Michell and Carrel party to numerous related party transaction. Prior to the Merger, CarLotz, Inc. incurred monthly management fees of $21,000 payable to TRP, of which $373,000 has been paid or accrued for the year ended December 31, 2020. CarLotz, Inc. had a payable to TRP, totaling $5.1 million as of December 31, 2020. Endurance Dealer Services LLC, which is owned by TRP, underwrites and administers contracts sold by CarLotz and is ultimately reinsured by Orange Peel Protection Reinsurance, Ltd., a wholly-owned subsidiary of CarLotz. In 2019, as part of its normal course of business, CarLotz entered into a Master Services Agreement with Flex Fleet Rental LLC, as one of the

corporate vehicle sourcing partners that CarLotz services. TRP is an investor in Flex Fleet Rental LLC. The history of, and prospect of doing more, business between the two companies casts renders Defendants Michell and Carrel unable to disinterestedly and independently consider commencing litgation against themselves and the other Individual Defendants.

147.    On January 21, 2021, the Company entered into a registration rights and lock-up agreement (the "Registration Rights and Lock-Up Agreement") with Acamar Sponsor—an entity controlled by Defendant Solorzano—and certain pre-Merger CarLotz stockholders (the "New Holders" and, collectively with Acamar Sponsor, the "Holders"). The terms of the Registration Rights and Lock-Up Agreement required the Company to, *inter alia*, file and have declared and maintained effective a registration statement to register the resale of certain shares of common stock held by the Holders. This registration statement was declared effective on March 23, 2021.

148.    Moreover, the Registration Rights and Lock-Up Agreement gives Defendant Bor, TRP—i.e., Defendants Mitchell and Carrel—and Acamar Sponsor—i.e., Defendant Solorzano (the "Demanding Holders")—two demand rights each, allowing giving them to demand that the Company file a registration statement to register the securities of the Company held by the Demanding Holder, and each may specify that such demand registration take the form of an underwritten offering. The Demanding Holders have unlimited rights to request that the Company register an underwritten offering pursuant to the resale registration statement. Holders also have "piggy-back" registration rights. The Registration Rights and Lock-Up Agreement further provides that the Company will pay certain expenses relating to such registrations and indemnify the Holders against (or make contributions in respect of) certain liabilities that may arise under the Securities Act of 1933.

149.    With these rights, and the value they represent for each of the Holders,

36

Defendants Bor, Carrel, Mitchell, and Solorzano have conflicts of interest and are incapable of independently and disinterestedly considering a demand against themselves and the other Individual Defendants.

150.    Moreover, in connection with the Merger, Acamar Partners—controlled by Defendant Solorzano—entered into separate subscription agreements (each, a "Subscription Agreement") with a number of purchasers (the "Subscribers"), pursuant to which the Subscribers agreed to purchase, and Acamar Partners agreed to sell to the Subscribers, shares of common stock (the "PIPE Shares"), for a purchase price of $10.00 per share and an aggregate purchase price of $125.0 million (the "PIPE Investment"). Pursuant to the Subscription Agreements, the Company is required to file and maintain an effective registration statement with respect to the PIPE Shares for the benefit of the Subscribers.

151.    As part of the PIPE Investment, among other Subscribers, TRP—controlled by Mitchell and Carrel—purchased 1,000,000 PIPE Shares for $10,000,000, Defendant Bor purchased 166,000 PIPE Shares for $1,660,000, and Acamar Sponsor—controlled by Defendant Solorzano—purchased 250,214 PIPE Shares for $2,502,140.

152.    Because of these conflicts of interest, Defendants Bor, Carrel, Mitchell, and Solorzano are further unable to independently and disinterestedly consider a demand against themselves and the other Individual Defendants.

153.    Defendants Kauss, Sheehy, and Skinner (the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with laws and regulations. The Audit Committee Defendants failed to ensure the integrity of the

Company's internal controls, allowing the materially misleading financial statements to be disseminated in the Company's SEC filings and other disclosures. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

154.    CarLotz has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for CarLotz any part of the damages CarLotz suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

155.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

156.    The acts complained of herein constitute violations of fiduciary duties owed by CarLotz's officers and directors, and these acts are incapable of ratification.

157.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of CarLotz. If there is a directors' and officers'

liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of CarLotz, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

158.    If there is no directors' and officers' liability insurance, then the Director Defendants will not cause CarLotz to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

159.    Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least four of the Director Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**<u>FIRST CLAIM</u>**

**Against the Director Defendants for Violations of Section 14(a) of the Exchange Act**

160.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

161.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate

commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

162.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

163.    Under the direction and watch of the Director Defendants the 2021 Proxy Statement failed to disclose that contrary to the 2021 Proxy Statement's descriptions of the Board's risk oversight function and the Audit Committee's responsibilities, the Board and its committees were not adequately exercising these functions, were causing or permitting the Company to issue false and misleading statements.

164.    The 2021 Proxy Statement also failed to disclose that: (1) to minimize returns to the corporate vehicle sourcing partner accounting for over 60% of the Company's inventory, the Company engaged in aggressive pricing; (2) due to the foregoing, the Company's GPU forecast was inflated; (3) due to market conditions, this corporate vehicle sourcing partner was likely to pause consignments to the Company; and (4) the Company failed to maintain internal controls. As a result, the 2021 Proxy Statement was materially false and misleading.

165.    In the exercise of reasonable care, the Director Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements

contained in the 2021 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2021 Proxy Statement, including but not limited to, the election of Defendants Mitchell, Sheehy, and Solorzano.

166. The false and misleading elements of the 2021 Proxy Statement led to, among other things, the election of the Defendants Mitchell, Sheehy, and Solorzano, which allowed them to continue to breach their fiduciary duties to CarLotz.

167. The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2021 Proxy Statement.

168. Plaintiff, on behalf of CarLotz, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

169. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

170. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of CarLotz's business and affairs.

171. Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

172. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of CarLotz.

173. In breach of their fiduciary duties owed to CarLotz, the Individual Defendants

willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) because of "surge in inventory" during the second half of 2020, the Company was experiencing a "a logjam that resulted in slower processing and higher days to sell[;]" (2) because of this, the Company's GPU would be negatively affected; (3) to minimize returns to the corporate vehicle sourcing partner accounting for over 60% of the Company's inventory, the Company engaged in aggressive pricing; (4) due to the foregoing, the Company's GPU forecast was inflated; (5) due to market conditions, this corporate vehicle sourcing partner was likely to pause consignments to the Company; and (6) the Company failed to maintain internal controls. As a result of the foregoing, CarLotz's public statements about its business, operations, and prospects were materially false and misleading at all relevant times.

174.   The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

175.   Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

176.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed

42

knowingly or recklessly and for the purpose and effect of artificially inflating the price of CarLotz's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

177.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

178.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, CarLotz has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

179.     Plaintiff on behalf of CarLotz has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Unjust Enrichment

180.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

181.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, CarLotz.

182.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from CarLotz that was tied to the performance or artificially inflated valuation of CarLotz, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

183.     Plaintiff, as a shareholder and a representative of CarLotz, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation,

including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

184.    Plaintiff on behalf of CarLotz has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Abuse of Control

185.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

186.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence CarLotz, for which they are legally responsible.

187.    As a direct and proximate result of the Individual Defendants' abuse of control, CarLotz has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

188.    Plaintiff on behalf of CarLotz has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

189.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

190.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of CarLotz in a manner consistent with the operations of a publicly-held corporation.

191.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, CarLotz has sustained and will continue to sustain significant damages.

192.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

193.     Plaintiff on behalf of CarLotz has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

194.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

195.     The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

196.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused CarLotz to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

197.     As a result of the waste of corporate assets, the Individual Defendants and are each liable to the Company.

198.     Plaintiff on behalf of CarLotz has no adequate remedy at law.

## SEVENTH CLAIM
### Against Defendants Bor and Stoltz for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

199.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

200.     CarLotz, Defendant Bor, and Defendant Stoltz are named as defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If

and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Bor's and Stoltz's willful and/or reckless violations of their obligations as officers and/or director of CarLotz.

201.    Defendants Bor and Stoltz, because of their positions of control and authority as CEO and CFO of CarLotz, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of CarLotz, including the wrongful acts complained of herein and in the Securities Class Action.

202.    Accordingly, Defendants Bor and Stoltz are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

203.    As such, CarLotz is entitled to receive all appropriate contribution or indemnification from Defendants Bor and Stoltz.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of CarLotz, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to CarLotz;

(c)    Determining and awarding to CarLotz the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and

severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing CarLotz and the Individual Defendants to take all necessary actions to reform and improve CarLotz's corporate governance and internal procedures to comply with applicable laws and to protect CarLotz and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2.  a provision to permit the shareholders of CarLotz to nominate at least four candidates for election to the Board;

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding CarLotz restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: October 20, 2021

**THE BROWN LAW FIRM, P.C.**

*/s/ Timothy Brown*
Timothy Brown
Saadia Hashmi
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net
       shashmi@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

I, Julian Cha am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _th day of _____, 2021.

10/19/2021

DocuSigned by:

1FD94CE4A98A4B6...

_____

Julian Cha